## Case No. 3,924.

### Case of DISTRICT ATTORNEY OF UNIT- ED STATES.

[25 Leg. Int. 348; 7 Am. Law Reg. (N. S.) 786; 8 Int. Rev. Rec. 137–145; 3 Am. Law Rev. 387.] [1]

District Court, E. D. Pennsylvania. Oct. 8, 1868.

OFFICERS OF THE UNITED STATES — APPOINTMENT IN RECESS OF SENATE—TENURE OF OFFICE ACT.

1. The term for which the incumbent of an office, whose duration was limited by law, had been appointed by the president with the concurrence of the senate, expired when the senate was in session. No appointment in which the senate concurred was made at that session, and the president, in the ensuing recess, appointed another person to the office by a commission to expire at the end of the next session of the senate.

[Cited in Re Marshalship for Southern Dists. of Alabama, 20 Fed. 382.]

2. It seems that the former incumbent's term was not extended by the tenure of office act of March 2, 1867 [14 Stat. 430]; and that the subsequent appointment could not constitutionally take effect, the vacancy not having happened during a recess of the senate.

[Proceedings upon the question of incumbency of the office of attorney for the United States in the eastern district of Pennsylvania.] [2] The question depended principally upon the effect of two clauses of the constitution. One of them provides that the president shall nominate, and, by and with the advice and consent of the senate, shall appoint all officers whose appointments are not otherwise provided for in the constitution, and which shall be established by law. The other clause provides that the president shall have power to fill up all vacancies that may happen during the recess of the senate, by granting commissions which shall expire at the end of their next session. The 1st section of the act of congress of the 2d of March, 1867, known as the "Tenure of Office Act," is in the words—"Every person holding any civil office to which he has been appointed by and with the advice and consent of the senate, and every person who shall hereafter be appointed to any such office and shall become duly qualified to act therein, is, and shall be, entitled to hold such office until a successor shall have been in like manner appointed and duly qualified, except as herein otherwise provided." The provision of the section which follows applies only to the heads of the executive departments of the government. The 2d section authorizes the president, during the senate's recess, to suspend for reasons and upon evidence to be reported by him to the senate, within twenty days after the commencement of their next session, all officers except judges of the courts of the United States; and to designate a suitable person to perform, temporarily, the

duties of any such officer until the senate's next meeting, and their action upon the case; but does not authorize the removal of the former incumbent, unless the senate concur in the suspension and removal. The 3d section enacts—"That the president shall have power to fill all vacancies which may happen during the recess of the senate, by reason of death or resignation, by granting commissions which shall expire at the end of their next session thereafter. And if no appointment by and with the advice and consent of the senate shall be made to such office so vacant or temporarily filled as aforesaid, during such next session of the senate, such office shall remain in abeyance without any salary, fees, or emoluments attached thereto until the same shall be filled by appointment thereto by and with the advice and consent of the senate; and, during such time, all the powers and duties belonging to such office shall be exercised by such other officer as may by law exercise such powers and duties in case of a vacancy in such office." The words of the 4th section are—"That nothing in this act contained shall be construed to extend the term of any office, the duration of which is limited by law."

The office of attorney for the United States was established in every judicial district by the judiciary act of 24th September, 1789 [1 Stat. 73]. By the act of 15th May, 1820 [3 Stat. 582], the duration of the term of the office was limited to four years. By an act of 2d August, 1861 [12 Stat. 285], the attorney-general was charged with the general superintendence and direction of the attorneys and marshals of all the districts, as to the manner of discharging their respective duties; and they were required to report to him an account of their official proceedings, &c., as he might direct. By the same act the attorney-general was empowered, whenever in his opinion the public interest might require it, to employ and retain, in the name of the United States, such attorneys and counsellors at law as he might think necessary to assist the district attorneys in the discharge of their duties. Before the tenure of office act Charles Gilpin, Esq., was, during a session of the senate, appointed to the office of attorney for the United States in this district by the president, with the advice and consent of the senate, for a term of four years, which expired when the senate was in session, on 15th March, 1868. For more than five months after this expiration of Mr. Gilpin's term he acted constantly, in and out of court, as the incumbent of the office, and was constantly recognised as such incumbent in correspondence and in other modes by the attorney-general and the officers of other executive departments of the government. On 20th April, 1868, however, the president, during the same session in which Mr. Gilpin's term of office expired, had nominated John P. O'Neill, Esq., to the office. On the 27th July, 1868, the senate ad-

---

[1] [Reprinted from 25 Leg. Int. 348, by permission. 3 Am. Law Rev. 387, contains only a condensed report.]

[2] [From 7 Am. Law Reg. (N. S.) 786.]

journed without having acted upon this nomination. [This adjournment was under a joint resolution, of 22d July, that the president of the senate and speaker of the house of representatives should, on the 27th of that month, at noon, adjourn their respective houses until 21st September, and on that day, unless it should be then otherwise ordered by the two houses, should further adjourn their respective houses until the first Monday of December.][2] On Saturday, 22d August, 1868, in the recess of the senate the president appointed Mr. O'Neill to the office by a commission to expire at the end of the next session of the senate. On Monday, 24th August, 1868, Mr. O'Neill saw the judge at chambers. He was desirous that the judge should administer the oath of office to him, and that it should be filed in the clerk's office of this court. Mr. Gilpin was not present, the state of his health not admitting of his absence from his own house. But he sent a message that he did not recognise any right in Mr. O'Neill to the office. The judge doubted whether either of the gentlemen was a rightful incumbent. The judge said that he would not then administer the oath to Mr. O'Neill, or permit the filing of it in the clerk's office, because to do so might seem to prejudge the question of incumbency, and might perhaps have a tendency to make Mr. O'Neill the apparent incumbent of the office in fact whether he were such of right or not. The judge suggested that the oath could be as well taken before any other magistrate qualified to administer it, and that it might, with equal effect, be filed in the office of the law department, at Washington. It was accordingly filed there, having been taken before a commissioner.

The court was in session from 1st to 24th of September, and on every succeeding day. On Monday, 21st September, 1868, the senate sat and adjourned. In the meantime, Mr. O'Neill had not been in court; and the business of the United States in court had been transacted by Mr. Gilpin, or by Mr. Valentine who had been previously retained by the attorney general to assist in the discharge of the duties of the office. For several days, comprising the latter part of this period, the state of Mr. Gilpin's health had been such as to confine him to his house, and the business had been transacted by Mr. Valentine. On Saturday, 19th of September, Mr. Gilpin received from the attorney general a written direction to transfer the business of the office to Mr. O'Neill. On the 21st, 22d and 23d of September, Mr. Gilpin was confined to his house, and Mr. Valentine was in court transacting business of the United States which required attention. On the 24th neither of them was in court. Mr. Valentine having left Philadelphia to be absent until the 28th. On the 24th a clerk in the office of the district attorney handed to

the clerk of the court a written order to issue process at the suit of the United States, subscribed with the name of Mr. Gilpin as the district attorney. The clerk of the court thereupon consulted the judge, who was informed of the instructions received by Mr. Gilpin on the 19th of September from the attorney general. The judge postponed the consideration of the question till the next morning, saying, that although he had doubted Mr. O'Neill's right, he had also doubted whether Mr. Gilpin was a rightful incumbent; and that he doubted whether, independently of any question of right, Mr. Gilpin could any longer be considered as the incumbent in fact. The judge added that as there might be temporary public inconvenience from uncertainty whether the government was regularly represented in its local court of ordinary criminal and fiscal jurisdiction, he would not refuse to hear, at the request of either Mr. Gilpin or Mr. O'Neill, with due notice to the other, an argument upon the right of either of them to a provisional recognition of him as the incumbent of the office. How far such provisional recognition of either might affect the legal question of incumbency in fact, the judge said that he did not know; but he said that certainly such a provisional recognition could not affect the question of incumbency of right. This question of right to the office, he said, could not be thus decided collaterally and informally.

The judge added that, although such an argument were not desired on either side of the question, yet, if he should, without hearing one, be able, upon reflection, to form an opinion favorable to either side, it would, he thought, be his duty to act upon such opinion till the question of right should be adjudicated.

In the afternoon of the same day the judge, at chambers, was informed by the counsel of Mr. Gilpin, that he was desirous of being heard upon the question asked by the clerk. The judge suggested the propriety of giving notice to Mr. O'Neill or to his counsel.

On 25th September, Mr. Brightly, counsel for Mr. Gilpin, and Mr. O'Neill and his counsel, Mr. Hirst, were in court.

Mr. Hirst produced a letter from the attorney-general, dated 22d September, recognising Mr. O'Neill as the attorney for the United States in this district, and renewing the direction to him to proceed in the discharge of the duties of the office.

The judge said that this letter having been written after the adjournment of the senate on 21st September, there appeared to be a question whether the meeting of the senate on that day was a session at the end of which Mr. O'Neill's commission, if otherwise valid, had expired. The adjournment and re-assembling of congress, were under a joint resolution, of 22d July last, that the president of the senate and speaker of the

[2] [From 7 Am. Law Reg. (N. S.) 786.]

house of representatives should, on the 27th of that month, at noon, adjourn their respective houses until 21st September, and on that day, unless it should be then otherwise ordered by the two houses, until the first Monday in December. The only proceedings of congress on 21st September, consisted in an adjournment under a joint resolution that the president of the senate and speaker of the house of representatives adjourn their respective houses until noon on the 16th day of October, 1868, and that they then, unless otherwise ordered by the two houses, further adjourn their respective houses until the 10th day of November, 1868, at noon, and then, unless otherwise ordered by the two houses, they further adjourn their respective houses until the first Monday of December, 1868, at noon.

Mr. Hirst asked that the hearing upon Mr. Brightly's application should be postponed until Monday, 30th September, to give an opportunity for other counsel of Mr. O'Neill to be present. This was agreed to.

On 30th September, the case, having been partially argued, again stood over at the request of counsel till 2d October, when the argument was closed.

In consequence of these suggestions of the judge, there was, at the instance of Mr. Gilpin's counsel, an argument on 30th September and 2d October, by

Mr. Brightly and George D. Budd, for Mr. Gilpin, and

Mr. Hirst, for Mr. O'Neill.

CADWALADER, District Judge. The act of congress of 13th July, 1866 [14 Stat. 92], prohibits the dismissal of any officer from the military or naval service in time of peace, except in pursuance or in commutation of the sentence of a court-martial. The act of 2d March 1867, known as the "Tenure of Office Act," applies to civil offices whose tenure is not constitutionally defined, and to which appointments cannot be made, when the senate is in session, without the advice and consent of the senate. In what follows, the general word "offices" will be understood as designating such offices. Their tenure is defined by the act in such a manner as to prevent the removal of their incumbents by the president without the senate's concurrence, and also to prevent vacancies from occurring in a recess of the senate, otherwise than by death or by resignation. To this intent the tenure is in general continued by the act until the senate's concurrence in the president's appointment of successors. Of two exceptions of certain classes of officers from the general enactments, one which is at the close of the 1st section has of late been much considered. It does not concern any present question. The other exception is in the enactment of the 4th section that nothing contained in the act shall be construed to extend the term of any office the duration of which is limited by law. A previous act of congress had limited the duration of the term of the office in question to four years. Mr. Gilpin's term expired on 15th March last. The office then became vacant, if the words of the 4th section of the tenure of office act are to be understood according to their unqualified literal import. If this literal construction would, in any great measure, frustrate the general purposes of the act, any other interpretation comporting with the words and the motives of legislation, and with the constitution, would be preferable. But of the offices under the government at the date of the act, the greater number by far were held for an indefinite period. See the Tabular Analysis. Report of Impeachment of the President, I., 548–554. The words of the 4th section may therefore be understood and applied according to their simple and literal import, without frustrating, in any material degree, the general purposes of the act.

If another meaning, not so simple but more consistent with any apparent general motives of legislation, might be attributable to the words, it could not be reconciled in every respect, nor for all the purposes of this case, with constitutional definitions of the powers of congress. The general enactments of the 1st section expressly apply alike to offices held under appointments prior to the act, and to those held under subsequent appointments. As to the latter, there is no doubt of the power of congress to prolong conditionally or provisionally the tenure of an office like that in question beyond the expiration of any certain term in it formerly limited by statute. The prolongation might have been absolute, and there is no reason that it may not be contingent, qualified, or conditional. In any such case the original appointment of the future incumbent is for the prolonged period. By "future" incumbent I mean of course one appointed after the enactment conditionally prolonging the tenure. But the present case of a person who at the time of the enactment was already in office for a limited term, is different. Congress can, it is true, abrogate offices established by legislation, and can abridge the term or tenure of an existing office like this. But the constitution does not confer any power on congress to extend an existing term in such an office in such a manner as to prolong absolutely or conditionally the tenure of a present incumbent. This cannot be done otherwise than by a renomination or new appointment by the president, and concurrence of the senate, as to the additional period. If the constitutional power to do this by mere legislation did not exist, Mr. Gilpin's term or tenure cannot have been enlarged. I perceived from the first this difficulty in his case, but was not disposed to assume that any part of an enactment by congress was unconstitutional without hearing an argument of the question. In arguing it his counsel have

relied on the authority given by the constitution to make all laws necessary and proper for carrying into execution the specified powers of congress, and all other powers vested by the constitution in the government, or in any of its departments or officers. If the aid of this power of incidental legislation could be thus invoked without first establishing the existence of an appropriate principal power, indefinite usurpation of authority by the legislative organ of the government would be promoted. Congress has no power thus indirectly to determine who shall be the incumbent of an office. Consequently Mr. Gilpin could not. under any interpretation of the act, be in office. The existence of this constitutional difficulty may assist in explaining the intent and purpose of the 4th section of the act. The difficulty did not indeed apply to future incumbents of offices whose terms are of limited duration. But without looking outside of the act itself, we can see that political motives may have induced its framers to consider principally the case of present incumbents; and that if their tenure could not be prolonged, the distinction as to future incumbents may have been disregarded as comparatively unimportant. The unqualified exception of all offices held or to be held for limited terms may thus become intelligible. Therefore, whether, the constitutional power of congress, or the simple meaning of the act, is to be considered, Mr. Gilpin is not of right in office. Whatever may have been the state of the question of incumbency in fact until 19th September, when he received the attorney-general s letter of the previous day, the effect of this letter was to terminate the relations on which incumbency, independently of the question of right, depended. If this were otherwise doubtful, it would be necessary to consider essential peculiarities of the office which require the continuance of a relation of attorney or counsel to client. If unquestionable right in such an office might carry with it a constructive incumbency in fact where no adverse occupation of the office existed, or if actual occupation of it continuing under the assertion of a questionable right could constitute incumbency in fact. it would not follow that there could, without right. be a merely constructive incumbency in fact.

The questions upon which Mr. O'Neill's right depends are, 1. Whether the president can, during a recess of the senate, make a temporary appointment to fill a vacancy in office in a case in which the senate has been in session either when or since the vacancy first occurred. 2. Whether there was a recess of the senate upon the adjournment of congress on 27th July last. 3. Whether the subsequent meeting of the senate on 21st September, was such a session that their adjournment on the same day terminated a commission granted in the recess to expire at the end of their next session.

In the statement of the first question the phrase "temporary appointment" has been used. There is no such expression in the provision of the constitution which confers on the president power to fill up vacancies that may happen during the recess of the senate. This provision authorizes him to fill them by granting commissions which shall expire at the end of the senate's next session. Such appointments have, nevertheless. ordinarily been designated as "temporary." The expression is borrowed from the provision of the constitution, that if vacancies in the senate happen, by resignation or otherwise, during the recess of the legislature of a state, the executive of such state may make temporary appointments until the next meeting of her legislature which shall then fill such vacancies. Here the context of the phrase "next meeting" necessarily imports an extension of time in order that the vacancies may be duly filled. For this reason, and in order to harmonize the provision with that empowering the president to fill vacancies happening during the recess of the senate. this phrase "next meeting" has been uniformly understood by the senate, in determining the qualifications of its members. to be of equivalent import with "next session," and to include the whole session.[3] There is thus a very close analogy between the two provisions of the constitution; and the phrase "temporary appointment" may properly be understood as of like import in each. The phrase "permanent appointment" has, by contrast, a meaning which cannot be misunderstood in its application to an appointment by the president, concurred in by the senate.

The question will first be considered solely upon the effect of the provision of the constitution as to the power of the president. Those on the affirmative side contend that the provision must be understood as enabling him to grant a temporary commission whenever there may happen to be a vacancy during a recess of the senate, whether the senate was or was not in session when the vacancy occurred, or has or has not been since in session. The argument is that the words "may happen" upon whose effect the question depends. can be understood as meaning, not "happen to occur," but "happen to exist," and that this construction must be adopted because the opposite one would be less conformable to the reason, spirit and purpose of the constitution. which, according to the argument, were only to prevent embarrassments of the government, and occasional dangers, from the existence of vacancies in office when the senate might not be in session. The public inconvenience or danger to public interests, from the continuance of a vacancy after a session of the senate, is quite as great as from the occurrence of a vacancy during a recess. It is contended that the exigencies of the gov-

[3] The decision of General Smith's Case, in 1809, to this effect, has been acted upon uniformly in a great number of cases.

ernment required, therefore, a like remedy of the evil in each case; and examples have been adduced of cases in which it may be "nearly or quite impossible" for the president to send in a nomination before the adjournment of the senate, or for the senate to act upon his nominations though made in season for their action.

There are serious objections to so broad an extension of the presidential power in question. Such an extension of it, if established, would enable the president to do indirectly, what the constitution does not allow him to do directly. His appointments during recesses of the senate might be so made and renewed that they could not properly be called temporary. They might, moreover, be withdrawn from the consideration of the senate. Thus he might, though the senate were in session when the vacancy first occurred, or had sat since it thus occurred, appoint, in the recess, an officer who would be objectionable to the senate if in session,—and might, in disregard or defiance of the senate, continue him in office indefinitely. This might be done by successive appointments and re-appointments of him at the commencement of every recess until the end of the next ensuing session of the senate. There is nothing in the political experience of our country to warrant her security against such temporary appointments being thus made again and again with such results. The senate, where vacancies existed, would thus be unable to oppose any effectual check to the president's power of appointment. To avoid the danger of impeachment of a president, the appearance of defiance of the senate might be avoided by not making nominations during the session, or abstaining in the recess from the re-appointment of rejected persons, but substituting other appointees, who, if the senate were sitting, would be not less objectionable. This would be no visionary danger where the president and a majority of the senate are of different political opinions. If it had been intended to give such an amplitude of power to the president, his authority to fill vacancies in office would not have been limited to those happening during a recess, nor limited to grants of commissions to expire at the end of the senate's next session. He would have been expressly authorized, in every case of a vacancy existing during a recess, to grant commissions to continue until a new appointment by him with the advice and consent of the senate. The general question has from time to time arisen, as will be seen hereafter, in different specific forms. In some of these forms of it, the words of the constitution might, without straining them, be accommodated to either an affirmative or a negative answer. But, in other forms of it, those persons who, in argument, support the affirmative, must, in candor, admit that their construction is not conformable to either the literal or the ordinary import of the words "may happen." If the purpose of the consti-

tution had been demonstrable to confer, as the argument assumes, an unqualified executive power to prevent at all times the continuance of any vacancies during recesses of the senate, the latitude of construction contended for might be less objectionable, though there is always great political danger from enlarged constructions of the constitution upon such reasons. The danger from them may be unseen until too late to avoid it. But was the purpose of the constitutional provision thus unlimited? According to Judge Story (Const. § 1551), the purpose was, "that the president should be authorized to make temporary apopintments during the recess, which should expire when the senate should have had an opportunity to act on the subject." According to the construction contended for, it is, on the contrary, unimportant whether the senate has had such an opportunity to act or not. The purpose attributed by Judge Story is thus disregarded in the argument on the affirmative side of the question. Before the adoption of the constitution, opinions differed, as they now may differ in the abstract, whether the president's power of making appointments to office, ought to be unchecked. In the opinion of some persons, he should have had the whole power without restraint or qualification. Others were appalled with various reasonable apprehensions of enormous and frightful dangers from uncontrolled power of appointment in a single magistrate. The reasons urged on the latter side prevailed. The constitution has, accordingly, opposed in the senate a barrier against uncontrolled executive power of the president in this respect. The constitutional policy having been established, it must be carried into effect without the influence of any abstract prejudice in favor of the opposite political theory. Fundamental opposing reasons of constitutional policy outweigh the argument which has been urged in favor of adopting the latitudinarian construction. The occasional evils which might be avoided through such a construction are more or less inseparable from any system of government of a free people. Under a complicated political system of mutually counteracting checks, like the government of the United States, the continuance of our freedom could not be maintained without incessant caution to guard against both executive and legislative encroachments. Either of them tends towards usurpations of despotic power, and the tendency may be so gradual as to be almost imperceptible. The dangers from such encroachments would be more serious than from the occasional suspension or inefficiency of governmental functions through temporary vacancies in office. More serious evils may occur through inaction of the legislative department of the government. A partial failure of the necessary annual appropriations by congress has occurred more than once; and, but for the call of an extra session, had once occurred on a large scale. Such a failure to legislate might suspend the

functions of the government. This, if it occurred, would not justify the executive in a violation of the constitutional provision that no money shall be paid out of the treasury without a legislative appropriation. Every extension of executive powers under any such emergency would, as I have said, be a step towards despotism; or, as may be added, might establish it at once. All evils to be apprehended from administrative inefficiency, are minor as compared with inevitable or probable consequences of the extension of legislative or executive power beyond the strict warrant of the constitution. It has been truly said that the dangers from extension of executive, may be less than are to be apprehended from that of legislative, power, because the president may, but congress cannot, be impeached for wilful abuse of constitutional power, though its limits be not exceeded. But the suggestion, however true, affords no sufficient answer to the objection against latitude in construing constitutional grants of executive power. If the general form of the present question were different, if the literal import of the constitution were in favor of the extended power, the argument might indeed be a fair one against excluding a construction which would conform to the import. We have seen already that if the existence of the power in question were admitted, it might be exercised most injuriously without any liability to impeachment. But the suggestion of the liability to impeachment may be disposed of on more general grounds. If such a suggestion were an answer to the objection against a constructive extension of the meaning of the constitution beyond the ordinary import of its words, the constitutional barriers against undue expansions of executive power would soon be burst asunder.

The constitution requires the president to take care that the laws be faithfully executed. It has been truly said that his duty therefore is to fill vacancies in office wherever the constitution confers on him the power to do so. This cannot imply that where the constitution does not expressly authorize him to fill vacancies, they can be temporarily filled by him under the provision of the constitution which requires him to take care that the laws be faithfully executed. There is no executive power conferred by the constitution which it would be more dangerous to enlarge through a loose construction upon suggested reasons of expediency, or of relative necessity. But this provision of the constitution has, if I am not mistaken, been sometimes invoked to aid the constructive enlargement of the provision authorizing him to fill vacancies that may happen during a recess of the senate. This cannot be a right view of the question. In some cases in which offices are vacant, the existence of the vacancies may render it impossible for the president to see to the execution of the laws. In such cases the laws cannot

be executed while the vacancies continue. In other cases there may be no such impossibility, or the temporary impossibility may not be a total one. In the latter cases, he may temporarily see, as far as possible, to the execution of the laws. But he does not thereby temporarily fill the vacant offices. They continue vacant, though functions corresponding more or less to their duties may thus be executed. This difference between filling a vacancy in office, and seeing that the vacancy occasions no failure in the execution of the laws, might be well exemplified in the present case of the office of attorney of the United States for a judicial district. If the office is vacant the greater part of its business, if not the whole of it, may nevertheless be transacted. The gentleman whom the attorney-general has employed under the act of 1861, as an attorney and counsellor, may represent the United States in their suits and prosecutions, and may otherwise discharge the duties, in the performance of which he would have assisted the district attorney if no vacancy had occurred. Should the existence of a temporary vacancy in the principal office be established, the circuit judge may, under an act of 3d March, 1863 [12 Stat. 768], temporarily fill the vacancy. His appointee will, under the constitution, be an officer of the court. If neither of these acts of 1861 and 1863 had been passed, the president might, through the attorney-general, as the head of the law department of the government, have retained an attorney or counsellor, not so permanently as the act of 1861 authorizes, but for the occasional purposes of the exigency. Such a lawyer's temporary representation of the United States in the legal business of the district would essentially differ from the temporary incumbency of an office. He would not be an officer of the United States.

For the reasons which have been stated, my opinion upon the first question, if considered as an open one, would be that the president cannot make the temporary appointment in a recess, if the senate was in session when, or since, the vacancy first occurred, and consequently that Mr. O'Neill is no more in office of right, than he would have been if commissioned by the president during a session of the senate without their advice and consent.

It is said, however, that the question is not open. I believe that it has never been judicially considered. But it is said that the existence of the power in question has been established by an administrative usage of forty-five years, during which appointments made in exercise of the power by successive presidents have been acquiesced in by the senate, and that this executive usage has, in this period, been founded on, or supported by, unvarying opinions of successive attorney-generals. Where an executive usage has been of long continuance, with constantly recurring opportunities for judicial contestation,

and the parties who might have contested have never complained, judicial tribunals may consider a truly doubtful question as to the constitutionality of the usage less open to forensic dispute than it would otherwise have been. The effect thus attributable to such a usage, may, in the absence of judicial contestation, be greater if legislative acquiescence has been evinced or may be implied. Any remaining doubt may be removed, or lessened, if uniformly concurring opinions of experienced statesmen, and of learned lawyers, in accordance with such a political usage, can be traced from an early period, more especially where such period was contemporaneous, or almost so, with the adoption of the constitution. Where all such conditions have been apparently fulfilled, a conclusion should not, however, be judicially reached upon such grounds alone, without caution. Have all or any and which of these conditions been fulfilled? In the outset of this inquiry it may be repeated that if the presidential power in question had been assumed and exercised with effect, where sufficient opportunities for judicial contestation were afforded, and no person had ever availed himself of any such opportunity, the inference of general acquiescence in the constitutionality of the asserted power might have been to some extent warranted. But there never was any such opportunity of contestation. Indirect contestation was impossible (see [U. S. v. Guthrie] 17 How. [58 U. S.] 284) and the president's power of removal would have precluded any direct contestation, if it had otherwise been practicable when the attorney-general was not a contestant. Until the acts of 1866 and 1867, which have been mentioned, the power of congress to define tenures of office in such a manner as to prevent removals at the mere will of the president had scarcely ever been exercised, though the legislative power to do so as to all offices whose tenure is not constitutionally defined was never doubtful. The recently-created office of comptroller of the currency was, I believe, the only one of which, at the dates of those acts, the incumbent was not removable by the president without any concurrence of the senate, and without any statement of reasons.[4] The president's general power of arbitrary removal where the tenure had not been otherwise defined by the constitution or by act of congress, was beyond question established. See [Ex parte Hennen] 13 Pet. [38 U. S.] 259. Of this power the former

existence and validity are not impliedly questioned by the acts of 1866 and 1867. The omission to litigate the question before the act of 1867, therefore, warrants no just inference of acquiescence in the alleged administrative usage. Even under this act judicial contestation may not readily occur.

In approaching the inquiry whether, and how far, any of the other conditions have been fulfilled, it may be remarked that from the distinguished eminence of some of the attorney-generals whose opinions will be mentioned, judicial deference might almost be due to their expositions of constitutional law, even where practical concurrence in them has not extended beyond the limits of executive administration. This may certainly be said of Mr. Taney, afterwards the venerated chief justice of the supreme court of the United States, and of Mr. Cushing, previously a judge of the supreme court of Massachusetts, whose opinions, while he was attorney-general, are, through the combination of doctrinal with practical instruction which distinguishes them, more useful perhaps than the writings of any publicist since Bynkershoek. Of course, I do not mean to intimate that through deference to any such extrajudicial opinions, I should surrender the judgment which it is my duty to exercise. But my judgment cannot be uninfluenced by the deference most justly due to them. Except in one respect, however, opinions of attorney-generals are, in themselves, of no more weight than those of as many private lawyers of equal abilities and acquirements. The exception, which may be an important one, is that the official opinions of attorney-generals may, for a long time, have been so uniformly acted upon by executive and legislative organs of the national government as to have become the unquestioned foundation of a system of legislation, or of administration. Such legislative and executive usages, when uniformly acquiesced in, especially where they have been open to judicial contestation, are, as I have already said, in themselves, more or less authoritative expositions of the true meaning and effect of the constitution. The opinion of a former law officer of the government, when it has been the foundation of such expositions, may be an important part of their legal history, and may therefore be cited in explanation of them, or even as having in itself, for this reason, a certain weight, perhaps, of authority. But the number of concurring official

---

[4] The acts of 1863 and 1864 made the comptroller of the currency appointable by the president on the nomination of the secretary of the treasury, and by and with the advice and consent of the senate. The comptroller thus appointed was, according to the act of 1863, to hold the office for a certain term, unless sooner removed by the president by and with the advice and consent of the senate, and according to the act of 1864, to hold for such term unless sooner removed by the president upon reasons to be communicated by him to the senate. Two prior acts, no longer in force, one of them passed in 1789, organizing the government of the

Northwestern Territory, and the other passed in 1836, organizing the government of that part of this territory which afterwards became the state of Wisconsin, were intended to execute the provision of the ordinance of 1787, that the tenure of judicial offices in the territory should be during good behavior. In the opinion of many persons, there was an honorary obligation of the constitutional government of the United States thus to execute this provision of the ordinance of the previous confederation. The judicial tenure in other territories of the United States has not been during good behavior.

opinions of attorney-generals on the same point adds very little to their weight, because, in the absence of judicial decision, these law officers of the government sometimes attribute to the opinion of an official predecessor an effect not much unlike that of an authoritative precedent. In one respect, indeed, the number of such official opinions may even detract from their weight, because, if the same question has been repeatedly stated anew, and renewals of the former opinions of attorney-generals upon it have been obtained from their successors, this may indicate that no settled administrative usage had been understood to be established under the former opinions.

In this connection I will state and explain what induced me to refer counsel, in the course of their arguments, to the opinions of commentators on the constitution who were either ignorant of these official opinions of the attorney-generals, or entertained opinions of a seeming opposite tendency. My purpose was to show that there had not been such a distinct prevalence of uniform opinions on the question as the counsel on one side had assumed. In his argument he had, as I thought, attributed an inherent force of authority to the official opinions which they did not possess. My reference to the commentators was intended merely as a suggestion that their opinions might be weighed in the opposing scale of his own balance. Among them was Judge Story, whose Commentaries have been cited occasionally, even by the supreme court, as elucidating questions of constitutional law, and Mr. Sergeant, afterwards a judge of the supreme court of Pennsylvania, who was often followed by Judge Story, and was not less learned and wise than cautious and accurate. Such references, whether to commentators, however eminent, or to attorney-generals, however distinguished, are outside of the ordinary proper line of argument in a judicial tribunal. But they are, when due caution is observed, not absolutely improper in excepted cases; and the present case, I think, is one. The question arose in 1823, in the same form in which it is presented in this case. The official term of a navy agent at New York expired when the senate was in session. During the same session another person was nominated by the president; but this appointment was not concurred in by the senate. The vacancy continuing to exist in the recess of the senate, Mr. Wirt, then attorney-general, was of opinion that the president could fill the vacancy by a temporary appointment. Mr. Wirt thought that the phrase of the constitution "happen during the recess" might be understood as meaning "happen to exist in a recess," whether the senate had or had not been in session when or since the vacancy first occurred. He supported this opinion upon reasons of convenience to prevent vacancies in office; and upon these reasons considered his interpretation the most accordant

with the spirit and purpose of the constitution, though the opposite interpretation would, as he conceived, be the most accordant with the literal sense and natural import of the words. In the form of the question in which it was next presented to an attorney-general, the possible dangerous political consequences of an affirmative answer were, in part, discernible. This was in 1832. A vacancy had occurred in a recess of the senate, by the expiration of the term of office of a register of the land office. During the same recess, a temporary appointment in his place had been made by a commission which was in force until the end of the next session of the senate. During this next session, the person thus appointed had been nominated by the president for the permanent appointment, and had been rejected by the senate. During the same session the same person had been nominated again. The latter nomination had been laid by the senate on its table. The senate had adjourned without having further acted upon the case. The opinion of the attorney-general, Mr. Taney, was asked by the president upon the question whether, during the recess of the senate, he could appoint the same person, or any one else, to the office. Mr. Taney was of opinion that the president could.

In accommodating this opinion to the letter of the constitution, there was less difficulty than in either of the two cases of the navy agents. The commission granted in the recess did not expire until the end of the next session, during which, no appointment was concurred in by the senate. The incumbency had thus continued until the commencement of the recess. As there had not been any vacancy during the session, the new vacancy might, even according to an almost literal import of the constitution, be understood as occurring, if not happening in the recess. But the difficulty in the way of accommodating such a construction to the spirit and purpose of the constitution was much greater than in the case which had been considered by Mr. Wirt. This difficulty I have explained. How the objection was overcome, without unduly slighting it, is not easily perceivable. The answer that the president might be impeached was the only one suggested. This answer is insufficient for the reasons which have been stated. The extent of the executive power to fill vacancies which these two opinions asserted does not appear to have been afterwards conceded. The previous tendency of Mr. Sergeant's views in an opposite direction will be mentioned hereafter. It may be remarked here that he published a revised edition of his treatise on Constitutional Law in 1830, seven years after the opinion of Mr. Wirt, without any adoption of Mr. Wirt's views, and without any material alteration of his own former text on this point. Judge Story, in his Commentaries, published in 1833, a year after Mr. Taney's opinion, did not cite it, nor that of Mr. Wirt,

nor express any such opinion; but on the contrary followed closely the text of Mr. Sergeant. In the editions of Chancellor Kent's Commentaries prior to 1841, when the opinions of the attorney-generals first appeared in print, he quoted the provision of the constitution authorizing the president to fill vacancies happening during the recess of the senate, but did not mention the point now in question in any form of the proposition. In subsequent editions the text is unchanged; but in a note he refers to Mr. Wirt's opinion without mentioning that of Mr. Taney, who was already chief justice. The opinion of Mr. Wirt was quoted by Chancellor Kent, but with a reserve which by no means indicates his adoption of it. In 1841 the question was referred anew to the attorney-general. Mr. Legare, in the broad general form of a proposition whether the clause of the constitution authorizing the president to fill up all vacancies that may happen during the recess of the senate, authorizes him to fill a vacancy so occurring after a session of the senate shall have intervened. The attorney-general objected to considering the question in so abstract a form; and restated the proposition so as to make it applicable in the case of a vacancy which had occurred during a recess, and had been filled by a temporary appointment, after which, the president, during a session of the senate, had made another nomination which was not acted upon by the senate; and so, the office being vacant in the ensuing recess, the restated question was whether the president had power to fill it again by granting a commission which should expire at the end of the next session of the senate. In this form of the question the attorney-general answered it affirmatively with reference to the words of the constitution, and to considerations of necessity or expediency. It has already been suggested that in such a special form of the question, the answer thus given could be accommodated to the words of the constitution. That these official opinions were not followed without scruple or hesitation appears from the constant recurrence of the question submitted, as it was, in different forms, to successive attorney-generals. Mr. Mason in 1846, Mr. Cushing in 1885,[5] and afterwards to others who concurred in the views of their predecessors. In October, 1862, however, Attorney-General Bates was consulted by the president as to "his power to fill a vacancy on the bench of the supreme court, then existing in the recess of the senate, which vacancy existed during and before the session of the senate." Mr. Bates, in his letter of reply, says: "If the question were new, and now for the first time to be considered, I

might have serious doubts of your constitutional power to fill the vacancy by temporary appointment in the recess of the senate. But the question is not new. It is settled in favor of the power to fill up the vacancy as far at least as a constitutional question can be settled by the continued practice of your predecessors, and the reiterated opinions of mine, and sanctioned, so far as I know or believe, by the unbroken acquiescence of the senate. Referring to the practice and to these authorities," he gave his opinion that the power was exercisable. Conformably to these views, Judge Davis was temporarily commissioned on 17th October, 1862, during the recess of the senate.[6] I believe that he did not take a seat upon the bench of the supreme court under this commission. The next session of that court began on 1st December, 1862. His permanent appointment was, I believe, sent into the senate on 3d December, and confirmed by the senate on or before 8th December, 1862, on which day his permanent commission bears date. He took his seat, as I am informed, on 10th December, 1862. In considering the effect of the opinions of the official predecessors of Mr. Bates,[7] it becomes important to correct the statement, in his opinion, that the exercise of the asserted presidential power had been "sanctioned by the unbroken acquiescence of the senate." The statement was founded on a mistake. The supposed foundation was in the fact, of which the truth may be here assumed, that in all the cases of permanent reappointment of temporary appointees which had occurred since 1823, the senate, in acting upon the permanent appointments, had not rejected any one merely because his temporary appointment had been made after a session in or before which the vacancy had first occurred; nor had in any wise discriminated unfavorably to any such appointee for such a reason. It is to be observed that in such a case the senate acts upon the permanent appointment only, and not upon the previous temporary appointment. This temporary appointment cannot possibly be submitted to them for their advice and consent. The mistake was in overlooking this impossibility, and supposing that the senate's approval of such a person's permanent appointment was a confirmation of his former temporary one. The senate's concurrence in any appointment by the president is properly called a confirma-

---

[5] The question was not directly involved in the subject of Mr. Cushing's opinion; but was considered by him incidentally in the course of an inquiry mentioned hereafter as to the president's power to appoint ambassadors, and other diplomatic ministers.

[6] In the argument at the bar, it was erroneously supposed that Judge Miller of the supreme court, had in like manner been commissioned by the president during a recess, and Judge Field in a manner somewhat similar. Judge Miller was, however, commissioned on 16th July, 1862, when congress was in session, and Judge Field on 10th March, 1863, during an extra session of the senate. Each appointment was of course with the advice and consent of the senate.

[7] For a reason, which will appear when we come hereafter to consider an act of congress of 9th February, 1863 [12 Stat. 642], it is not necessary to mention any opinions of attorney-generals subsequent to that of Mr. Bates.

tion of it, whether the appointee had received a previous temporary appointment or not. But when the same person who was temporarily appointed in a recess of the senate is permanently appointed, at the next session the permanent appointment only can be confirmed. The word "confirmation" is misapplied when the senate's concurrence in this appointment is called a confirmation of the former temporary one. The temporary appointment indeed merges in the permanent one when the latter is confirmed and accepted. But this neither makes the permanent appointment itself, nor makes the confirmation of it, a confirmation of the temporary one. If the senate rejects the appointee, or does not act upon his nomination for the permanent appointment, he nevertheless continues until the end of the session, to be in office under the former temporary appointment if it was a valid one.

The mistake originated I believe in official or semi-official language of persons employed in executive departments of the government, and from thence found its way into popular phraseology, and to some extent into that of legislation. Thus an act of congress of 1st May, 1810 [2 Stat. 608], prohibiting the payment of compensation to any chargé des affaires or secretary of legation, unless appointed by the president by and with the advice and consent of the senate, authorized him in the recess of the senate to make appointments to such offices which appointments should be submitted to the senate at their next session thereafter for their advice and consent. If diplomatic offices only had been the subjects of such legislation, it might have been explained for special reasons of peculiar applicability which will be mentioned hereafter. But there have been other subjects. The army appropriation bill of February, 1863, prohibits the payment of any money as salary to any person appointed during a recess of the senate to fill a vacancy in any existing office which vacancy existed when the senate was in session, and is by law required to be filled by and with the advice and consent of the senate until such appointee shall have been confirmed by the senate. And an act of 3d March, 1863, authorized the appointment of officers of the military signal corps; and, in order to allow time for a thorough examination of them, enabled the president to appoint them during the recess, requiring, in like manner, that the appointments should be submitted to the senate at their next meeting for their advice and consent. The advice and consent of the senate was in these acts treated as a confirmation of the previous temporary appointment. Notwithstanding this mistake, the acts of course took effect as intended, according to the popular but legally incorrect meaning of the words. Such a use of them by congress was not the less a mistake. The like mistake was not always made in congressional enactments. The act of 2d March,

1799 [1 Stat. 710], regulating the collection of duties on imports (section 17), and the act of 22d July, 1813, for the assessment and collection of direct taxes and internal duties (section 2 [3 Stat. 22]), each of which established collection districts or authorized their establishment, and provided for the appointment of collectors in every district, empowered the president, in case the appointment of the several collectors for the respective new districts should not be made during the existing session of congress, to make them during the recess of the senate by granting commissions which should expire at the end of their next session.[8] There have, I believe, been other acts of congress in which, as in the two latter enactments, the mistake was avoided. But it was not avoided in official parlance; and this may explain its occurrence in the opinion of Attorney-General Bates. If he had not made the mistake, his own doubts probably would not have been so readily resolved.

The mistake was corrected by the supreme court in 1824, in a case in which the court below had decided that, in point of law, both commissions of an appointee, the latter permanent, the former temporary, "constituted but one continuing appointment, the second commission operating only as a confirmation of the first;" and Mr. Wirt, then attorney-general, said in argument, in the supreme court, as to the two commissions, that "the practice of the government had been to consider them as one continuing commission." In the opinion of the supreme court "the decision of the court below was founded in mistake." The supreme court said that the two commissions could "not be considered as one continuing appointment without manifest repugnancy," that they were "not only different in date, and given under different authorities and sureties, but were of different natures" and durations. It was decided accordingly that the responsibility of a surety in the official bond of a temporary appointee terminated on his acceptance of the commission under his permanent appointment after it had been confirmed. [U. S. v. Kirkpatrick] 9 Wheat. [22 U. S.] 634, 735. This judicial correction of the mistake is important. The mistake should be viewed in the same light with reference to the political, practical, and moral, as with reference to the legal aspect of the question. The senate could not, even before the decision of the supreme court, much less could they afterwards, without mere causeless vindictiveness, discriminate in the matter in question by rejecting persons who had been temporarily appointed to fill vacancies which had existed when the senate was in session. The question of constitutional power was doubtful, or had been so considered. The temporary appointees were

---

[8] Commissions under the act of 1813 appear to have been granted by the president until the end of the next session of the senate, and no longer.

therefore morally blameless. After the decision of the supreme court, acquiescence in the president's assumption of the power in question could not be reasonably implied from the confirmation of an appointment which, according to the decision, was a new and different one, and was neither a continuation, nor a confirmation, of the questionable one. Thus rejection for this reason alone would have been wanton, arbitrary, and unjust, and, as excluding the inference of acquiescence, would have been useless. The supposition of acquiescence by the senate from their not having rejected the permanent appointees appears therefore to have been founded in a political as well as a legal mistake.

That it was such a mistake will appear more clearly when the views in which the senate has regarded the question are elucidated from positive sources. We may consider, first, decisions by the senate as to the qualifications of its members, and afterwards, proceedings of the senate as a co-ordinate branch of the executive government. The cases of Mr. Johns, in 1794, and of Mr. Phelps and Mr. Williams, in 1854, depended upon the effect of the above-mentioned provision of the constitution as to the power of the executive of a state to fill vacancies in the senate, happening during the recess of the legislature. The senate, in these cases, decided that when a vacancy thus occurred in a recess, the governor could not fill it during a subsequent recess, the legislature having sat in the interval,—that where he had properly filled a vacancy during the recess in which it occurred, the seat, unless filled by the legislature of the state, became vacant at the end of their next session,—and that although the vacancy afterwards continued, it could not be filled by the governor of the state. The vote excluding Mr. Johns from a seat was twenty to seven, when a full senate was composed of only thirty members. In the case of Mr. Phelps the whole subject was thoroughly considered and the vote was twenty-six to twelve. The case of Mr. Williams was decided without a division. It was urged in these cases with great earnestness, but in vain, that according to the reason, spirit, and purpose of the constitution, a state should not be unrepresented in the senate, that the evil resulting from a vacancy did not depend upon its cause, and that the provision of the constitution must have been intended to prevent vacancies by enabling the governor of a state to fill them temporarily so long as the legislature might be unable, or might fail, to do so. Such arguments closely resemble those which have been urged upon the present question. It would seem incongruous that the word "happen" upon whose application the question depends should not have a similar import in the two provisions of the constitution. We find, accordingly, that a broader meaning has not been attributed by the senate, as a co-ordinate branch of the executive, to the provision of the constitution which confers on the president power to fill vacancies in office that may happen during a recess. The question was first considered by the senate, acting in its latter capacity, with reference to the case of an office newly created by congress, and not filled before their adjournment. If the words of the constitution, "vacancies that may happen during the recess of the senate," instead of being referred to the first occurrence only of a vacancy, are to be understood as referable to any existence, or continuance of a vacancy, the constitution gives to the president, during the recess, to fill temporarily such newly-created offices. But if the provision of the constitution applies only to a recess in which the vacancy first occurs, he cannot thus fill them. There is, therefore, in principle, no difference between this form of the question and those other specific forms in which we have already considered it. Acts of congress purporting to enable the president to fill such newly-created offices during the recess, by temporary appointments, have already been mentioned. Such enactments have an independent effect, as legislative expositions, which will be considered hereafter, under a distinct head. In the mean time, it may be remarked here that the effect attributable to them has been considered by the senate, in its executive capacity, incidentally to inquiries how far the president may have an occasional power to appoint, without the senate's concurrence, commissioners to negotiate a treaty with a foreign state. An apparent digression will be necessary in order to explain how this inquiry arose. Congress may, through the power to regulate the compensation of diplomatic functionaries, and in some other modes, exercise indirectly more or less control over the intercourse of the government of the United States with foreign governments. But the president and senate, if the question of compensation could be excluded, would under the constitution have, in their executive capacity, almost unlimited control over such intercourse. The subject has been fully examined by Attorney-General Cushing, in a very lucid and instructive opinion of 25th May, 1855, upon the effect of the act of that year remodelling the diplomatic system of the government. In this opinion, in which, in most respects, I concur, the prior legislation, and prior executive usages, are historically investigated. The question, as between the president and the senate, of his power to negotiate primarily, without their participation, a treaty, though it cannot afterwards become binding until ratified by them, is a distinct proposition which, within certain limits, involves no difficulty. The question may, within, or beyond such limits, involve an inquiry as to his independent power to select and send the

negotiator. An ambassador,[a] or other public minister, whether designated as a commissioner, or by any other official title, cannot, except for purposes of mere occasional exigency, be constitutionally sent abroad otherwise than under such an appointment as that of any other officer of the government. But the president primarily represents the United States in the intercourse of their foreign relations, including the negotiation of treaties. He is by the constitution expressly authorized to receive ambassadors; and it has been supposed that a power inherent in his office may enable him to send special diplomatic representatives abroad whenever it may be necessary to do so for occasional public exigencies, whether the senate is in session or not. That even the occasional exercise of such an inherent or incidental power was jealously watched appears from the act of 1st May, 1810, which has been cited. The question of the existence of such a power, and the present question, are different, arising as they do, in part, under different provisions of the constitution. But with reference to the legislation as to newly-created offices, the present question was incidentally considered when an occasional diplomatic appointment was made in a recess of the senate. Our present inquiry is not whether the senate's views of the question as to an occasional diplomatic mission were right or wrong. That is here unimportant. The inquiry to be elucidated is whether the senate, in considering that question, admitted or denied the power of the president which is now in question. Upon this point Mr. Sergeant and Judge Story have referred to certain proceedings of the senate. In the year 1813, President Madison, during a recess of the senate, appointed commissioners to negotiate the treaty of peace afterwards concluded with Great Britain. Mr. Sergeant, after stating that the principle acted upon in this case was not acquiesced in, but was protested against at the succeeding session of the senate, says that, afterwards, in 1822, "during the pendency of the bill for an appropriation to defray the expenses of missions to the South American states, it seemed distinctly understood to be the sense of the senate, that it is only in offices that become vacant during the recess that the president is authorized to exercise the right of appointing to office, and that in original vacancies, where there has not been an incumbent of the office, such a power does not attach to the executive." He also quotes the coincident report of a committee of the senate made a few days later, in which it was declared that in the provision of the constitution as to vacancies that may happen during the recess of the senate, "the word 'happen' has reference to some casualty not

provided for by law," and that "if the senate be in session when offices are created by law, which were not before filled, and nominations be not then made to them by the president, the president cannot appoint after the adjournment of the senate, because in such case the vacancy does not happen during the recess." It was added that in many instances, where offices were created by law, special power was given to the president to fill them in the recess of the senate, and that, in no instance, had the president filled such vacancies without special authority of law. Mr. Sergeant and Judge Story quote these proceedings of the senate, and subsequent remarks of the committee of the senate, in such a manner as to imply that their own opinions coincided. The proceedings of the senate were in the year next before that of Mr. Wirt's opinion. We have seen that in 1824, the year next after his opinion, the decision of the supreme court that the senate's confirmation of a permanent appointment was not a continuance of a previous temporary commission of the appointee, removed any reason which there might previously have been for formal or informal protests by the senate in such of the cases of previous temporary appointment as might involve the present question. In 1825, a case occurred which, I think, shows that upon this question, in its general form, there was a contrariety of opinion between the president and the senate. This was the case of Amos Binney, whose commission as navy agent at Boston expired on 15th February, 1825, during the session of congress. Three days after, he was nominated to the senate for the same office. The session closed on 3d March, 1825, the senate adjourning without having acted on the nomination. The senate was convened for, and was in session on, the next day, 4th March, 1825. On the 7th of the same month Mr. Binney was renominated by the president. Two days later, the senate adjourned, having first postponed this nomination till the commencement of their next regular session, on the first Monday of December. During the recess, on 22d March, 1825, Mr. Binney was temporarily appointed to the office by President John Quincy Adams, in opposition, as it would seem, to the opinion of the senate. The postponement of the nomination by the senate, however it may have exceeded their legitimate power, indicated their dissent from Mr. Wirt's then recent opinion. If they supposed that the president would have the power to make the temporary appointment after their session, it does not seem at all probable that they would have passed the resolution to postpone.

Legislative expositions by congress will next be considered, not as decisive, in themselves, of any question, but as indicating concurrence or contrariety of opinion as to the existence of the power in question. Acts

---

[a] In the general sense in which the word is used in the constitution.

of 2d March, 1799, 1st May, 1810, 22d July, 1813, 9th February, 1863, and 3d March, 1863, have already been mentioned. How many more such enactments might be found upon searching the statute book, I do not know. They may be numerous. Those which have been cited are sufficient, as examples. It should be recollected that they did not all apply to newly created offices. The act of 9th February, 1863, on the contrary, applies to the question in its general form. These acts import a discrimination between cases in which the president has, and those in which he has not, the constitutional power to make temporary appointments, the difference being between the senate's having, or not having, been in session when, or since, the vacancy first occurred, —the very difference which the argument on the affirmative side of the present question supposes to have been constantly disregarded. If the acts of 1st May, 1810, and 9th February, 1863, were the only legislation to be considered, there might perhaps be dispute whether they should be understood as affirming the power of the president, and only checking its undue exercise, or as implying denial or doubt of the existence of such a power. To the act of 1810, the former motive might, upon reasons already explained as applicable peculiarly to diplomatic appointments, be imputed less objectionably than to the act of 1863. But such a construction even of the former act, and much more of the latter one, would impute motives of legislation which perhaps are not properly attributable to congress, because, if the president had the constitutional power, congress had not the power directly to prevent its exercise, and, in that case, perhaps ought not to have done so indirectly. Upon the other acts there can be no such dispute. In them, the question whether congress could vest the power in the president if it had not been conferred on him by the constitution, may indeed have been overlooked. But, however this may have been, it is quite certain, that the question of the existence of the president's power was legislatively considered. The express grant of power by these enactments implies that, in the opinion of congress, the constitution had not given the power to him, or, to say the least, indicates the constant doubt of congress on the subject. The counsel has, in argument, cited copiously the debate in the senate on the passage of the enactment of 9th February, 1863. The purposes for which such citations in a judicial tribunal are admissible must be very limited. One of them, under certain cautions, may, however, be to show on what points, and how, at the date of a statute, opinions differed as to what was the previous law. This debate shows that, upon the point of constitutional law now in question, two senators, each of whom had been a judge of the supreme court of his own state, differed in opinion whether the

president had the power under the constitution. The question cannot have been overlooked by those who framed the tenure of office act of 1867. They knew that constitutional doubts could not be resolved by legislation, and that if the presidential power in question existed under the constitution, legislation could not abridge it, otherwise than by so defining the tenure of offices as to diminish the frequency of occasions for its exercise. Aware of this, they seem to have discriminated between different specific forms of the general question, and to have intended to legislate for those cases only in which there would have been least difficulty in reconciling the president's assumption of the power with the literal import of the constitution. We have seen that the difficulty in this respect was greatest in cases like the present one of Mr. O'Neill, where the senate was in session when the vacancy first occurred. There is, accordingly, no provision for such cases in the act. In cases in which vacancies first occur during a recess, the presidential power is, during the same recess, unquestionable. But in such cases, according to the argument on the affirmative side of the present question, the temporary appointments of the same or other persons to fill the same vacancies, might be constitutionally repeated in recurring recesses. We have seen that such repeated temporary appointments, if they had not been repugnant to the spirit of the constitution, might perhaps, without much difficulty, have been accommodated to its letter. The 3d section of the act seems to have therefore been a legislative endeavor so to define the tenure as to prevent such repeated appointments, whether they would, if the tenure had not been so defined, have been constitutional or not. The section was, in short, a legislative effort to prevent the question, in this form of it, from arising. The first sentence of the section is a transcript of the constitutional provision with an insertion of the words "by reason of death or resignation," and an addition of the word "thereafter" at the close. The purpose of introducing the words "by reason of death or resignation" has already been explained. It was to prevent as much as possible the occurrence, during recesses of the senate, of any vacancies otherwise than by death or by resignation. The word "thereafter" was added in order to prevent the repetition of the temporary appointments to fill such vacancies. We are not at liberty to understand the word as a mere pleonasm. Congress, in making the addition to the words of the constitution, cannot have intended to deal so lightly with its language. If this word "thereafter" is to be referred grammatically to the nearest antecedent, which is "death or resignation," the apparent intent of congress to restrain the exercise of presidential power without the senate's concurrence, to the narrowest limit possible, is fulfilled. If the word "thereafter"

is to be referred, not to this grammatical antecedent, but to "recess of the senate," the result must be the same, because, to effectuate the same apparent legislative intent, such recess must here be understood as the recess in which the vacancy first occurred. Now the third section is inapplicable to vacancies which first occur when the senate is in session, whether they occur through death, or through resignation, or otherwise. This being so, it must be recollected that according to the general argument on the affirmative side of the question, if such vacancies continue till after the session, they become vacancies happening during the recess. It may be said, and, to a certain extent, correctly, that if the president has then power to fill them by temporary appointments, it cannot be abridged by congress. And this, if we stopped here, might explain the omission to legislate on the subject. But it must be recollected further, that, according to the same argument, the president may fill such vacancies again and again, by temporary commissions on every recurring recess, just as, according to the argument, he may thus repeatedly fill them where the vacancy first occurred in a recess. The act omits all provision against such repetitions of temporary appointments, where the first occurrence of the vacancies was during a session, but provides against them where it was during a recess. According to the argument the necessity was the same, or equally great, in both cases. How is this difference in the legislation to be explained? The only answer to this inquiry is, that congress discriminated between cases which, in the opinion of the attorney-generals, were, in principle, undistinguishable. The whole subject was perhaps thought to be involved in doubt and obscurity, so much so that perhaps no precisely definable views of the general question of constitutional law are attributable to congress.

On the whole question of acquiescence, positive or negative, we thus find in the present case, a difference in every respect from those cases in which points of constitutional law have been established on the foundation of administrative usage. We might, for example, contrast the present question with that of the president's power of removal from office.

To recapitulate, as to the present question: There has not been opportunity for judicial contestation: the existence of the power in question has not been legislatively recognised, has been denied by the senate, has been practically asserted by presidents only, and has not been exercised without constantly recurring suggestions by them of doubts of its existence under the constitution: opinions of attorney-generals have been its only support; and in these opinions, other jurists of eminence have not concurred. All this might have been said in language more decidedly showing that the question, whenever directly litigated, will be quite open for judicial contestation. At present, I cannot answer it affirmatively.

2d. The second question is one upon which opinions have, I believe, differed. It may depend, perhaps, in part, upon congressional usages, of which my knowledge is imperfect. In the present case, there cannot have been a recess of the senate unless there was a recess of congress. On every adjournment of congress, except such an occasional temporary one as does not suspend the course of business of the two houses, the interval until the next meeting should, I think, be deemed a recess. If so, there was here a recess on the adjournment of 27th July last.

3d. On the third question I incline to think that if the words, "unless it be then otherwise ordered by the two houses," had not been contained in the resolution of 22d July, the meeting of the senate on 21st September would have been such a session that the commission of Mr. O'Neill, if otherwise* valid, would have expired upon the adjournment on the same day. The insertion of the words which I quote, might not have prevented such a result, if anything had been done by the two houses to make the transaction of executive business by the president and senate possible, if the president and senate had desired it. But the adjournment excluded all business, and nothing had been done before it to permit the transaction of any business. The senate could not, however long they might have sat, receive a nomination to office from the president; and consequently there was, I incline to think, no such session that a temporary appointment, if otherwise valid, would have been terminated by the adjournment which occurred. I would have avoided intimating an opinion upon this point, if it had not seemed necessary, in order to explain my reason for expressing one upon the first question.

Upon the whole, I am of opinion that Mr. O'Neill is not a rightful incumbent of the office, and that any legal business which he may occasionally transact for the government, under its law department, or any other department, will not be conducted by him as the local law officer. Under the attorney-general's instructions and authorization of the 18th and 22d of September, I think that the clerk of this court should recognize Mr. O'Neill's right of directing process to issue at the suit of the United States. I consider the office, upon the question of rightful incumbency, to have been vacant, as I have said, from 15th March. But there may be a difference between Mr. Gilpin's authority before the 19th of last month, and Mr. O'Neill's present or occasional future authority. The existence of such a difference depends upon the question, whether Mr. Gilpin was, until the latter day, the incumbent in fact, though not of right. Mr. O'Neill cannot, through any future exercise of such authority as he now has, become the incumbent in fact, if he is not the incumbent of right.

His relations with the officers of the court will be thus understood. His occasional authority will be recognized as resting on this footing only, however he may describe it. There will be no implied acquiescence in his own definition of its character. Unless the definition is impliedly concurrent, such acquiescence cannot be inferred. What I have said will prevent any inference of tacit acquiescence from acts of the officers.